# Louisville & N. R. Co. v. Falls City Ice & Beverage Company, Inc.

(Decided June 16, 1933.)

EDWARD. S. JOUETT for appellant.

ARTHUR B. BENSINGER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

This suit was brought by the appellee, a manufacturer of a beverage from malt and other ingredients with an alcoholic content of not exceeding 3.2 per cent. of its weight, to compel the appellant, a common carrier engaged in both inter and intrastate commerce, to accept such product for transportation and to transport it from Louisville, Ky., to destinations within that state. The appellant resisted the demand of the appellee to have its beverage thus transported on the ground that such beverage was an intoxicating liquor and that to transport the same would be to violate laws prohibiting the intrastate transportation of intoxicating liquor. The lower court found that the beverage was not an intoxicating liquor and granted the appellee the relief it sought. From that judgment this appeal is prosecuted.

Prior to March 22, 1933, the transportation of the beverage here in question would have been a violation of the Volstead Act which forbade the transportation in either inter or intrastate commerce of all beverages exceeding one-half of 1 per cent. of alcohol by volume. The alcoholic content of the beverage here under consideration, 3.2 per cent. by weight, is equivalent to approximately 4 per cent. by volume. By the Act of Congress of date March 22, 1933, being House Resolution No. 3341 of the 73rd Congress (27 USCA sec. 64a et seq.), certain portions of the Volstead Act (27 USCA sec. 1 et seq.) were repealed and there were exempted from its operation, "beer, ale, porter, wine, * * *" containing "not more than 3.2 percentum of alcohol by weight." Since the alcoholic content of the appellee's product does not exceed that figure, its intrastate transportation manifestly does not violate any provision of the Volstead Act as it now stands. However, the United States Constitution is the supreme law of the land and the Eighteenth Amendment is still a part of it. That amendment among other things prohibits the transportation of "intoxicating liquors within * * * the United States." Further, section 226a of the Constitution of Kentucky, which is the Seventh Amendment to that Constitution and which was adopted in 1919, as well as section 1 of chapter 33 of the Acts of 1922, known as the Rash-Gullion Act, now section 2554a-1 of the Kentucky Statutes, likewise forbid the transportation in the Commonwealth of Kentucky of "spirituous, vinous, malt or intoxicating liquors except for sacramental,

medicinal, scientific or mechanical purposes." The transportation of nonintoxicating malt beverages is not forbidden by this Amendment to our Constitution or by section 1 of the Rash-Gullion Act. In the cases of Risner v. Commonwealth, 229 Ky. 486, 17 S. W. (2d) 401, Vanmeter v. Commonwealth, 232 Ky. 404, 23 S. W. (2d) 594, and Kalbfleisch v. Commonwealth, 237 Ky. 32, 34 S. W. (2d) 735, all involving prosecutions under the Rash-Gullion Act and all involving a malt beverage, it was held that to sustain such prosecutions it would have to be shown that such malt beverages were intoxicating in quality. Cf. City of Bowling Green v. McMullen, 134 Ky. 742, 122 S. W. 823, 26 L. R. A. (N. S.) 895. It follows that, if the appellee's product is a nonintoxicating beverage, there is no obstacle to its transportation either in intra or interstate commerce now, but if it is intoxicating then the injunction here sought should not be granted, for to do so equity would be ordering the doing of an act which would violate the Eighteenth Amendment, section 226a of the state Constitution, as well as section 1 of the Rash-Gullion Act. It therefore is necessary to be determined whether the beverage manufactured by the appellee is an intoxicating one or not.

In this jurisdiction, the question of the inclusion within our prohibition laws of a particular malt beverage depends on a finding that such beverage is in fact intoxicating. City of Bowling Green v. McMullen, supra; Gourley v. Commonwealth, 140 Ky. 221, 131 S. W. 34, 36, 48 L. R. A. (N. S.) 315. In the latter case, this court defined "intoxication" thus:

"In this connection we may add that 'intoxication' is not a technical word needing expert testimony to explain or define it. Drunkenness or intoxication in more or less degree is so common that there are few adult males who have not witnessed the intoxicating effect of liquor on other people, and therefore a person who has drunk a liquor or beverage said to be intoxicating may testify whether or not it intoxicated him, and he may also testify as to its intoxicating effect upon other persons that he knew had drunk the same kind of liquor or beverage. And, if there is an issue for the jury as to whether or not the accused sold a beverage that was intoxicating, it is not necessary that the court should

define the meaning of the word 'intoxicate.' Nor is it necessary that the commonwealth should show that the beverage will intoxicate every person who uses it in the largest practicable quantity. It will be sufficient to show that any person who uses it in the largest practicable quantity will become intoxicated.''

It is true that in cases arising prior to the late World War this court had laid down the proposition that it would take judicial notice that spirituous and vinous liquors, such as whisky, brandy, wine, and gin, as well as malt liquor, commonly known as beer, whether it be common, lager, or bock beer were intoxicating. But this rule was laid down at a time when almost all beers contained a much higher alcoholic content than 4 per cent. by volume or 3.2 per cent. by weight. Indeed, such beers had an alcoholic content in excess of 6.02 per cent. by volume or 4.81 per cent. by weight. This high alcoholic content found in the composition of then nationally known beers sold previous to the World War, such as Blatz Brewery's ''Wiener,'' Schlitz, Pabst's ''Blue Ribbon,'' Queen City Brewery's ''Edelbrau,'' Jung Brewery's ''Jung Brau,'' Aktein & Lowenbrau Brewery's ''Marzen Bier,'' Hammond Brewery's ''Muhlhauser,'' Anheuser Busch Brewery's ''Budweiser,'' Miller Brewery's ''Muenschner,'' Senn & Ackerman Brewery's ''Extra Brew,'' and Frank Fehr Brewery's ''F. F. X. L.,'' readily account for the rule adopted by this court. With the advent of the World War and later the passing of the Eighteenth Amendment, there came upon the market a product sometimes called ''near beer,'' but more often simply ''Beer,'' made of the same ingredients as the prewar intoxicating beer but dealcoholized to such an extent that it contained no more than one-half of 1 per cent. of alcohol by volume. This beverage was widely transported, sold, and drunk. Thereafter this court would not take judicial notice that any beverage called ''beer'' was intoxicating in fact, but left that issue to be determined in each case as any other fact is determined when drawn in issue in a law suit. Kalbfleisch v. Commonwealth, supra; Risner v. Commonwealth, supra; Vanmeter v. Commonwealth, supra. Such being the present state of the law, whether or not the beverage here in question is an intoxicating one is an issue of fact to be determined by the evidence ad-

duced. The evidence offered on that subject is comprised in the main in a printed stenographic report of the hearings before the Committee on Ways and Means of the House of Representatives on the question of the modification of the Volstead Act. This hearing included the evidence of numerous laymen and medical authorities on the question as to what per cent. by weight of alcohol a malt beverage may contain without being classified as an intoxicating liquor. This evidence covered a wide field. There were also introduced before the chancellor witnesses who testified concerning their own experience with or observation of the effects of this new beverage since its appearance on April 7, 1933. The chancellor after considering all the evidence produced before him came to the conclusion that a malt beverage containing not more than 3.2 per cent. of alcohol by weight is not intoxicating when taken in the largest practicable quantity. We quote from his opinion as to this conclusion of fact:

"It would serve no useful purpose to undertake to summarize that evidence (i. e. that heard before the House Committee). And to do so would transform this opinion into a treatise on the effects of the alcohol on the human system. Instead I shall only point out certain salient facts which, I think, compel the conclusion just reached.

"Intoxication results from the presence of alcohol in the blood stream. But when alcohol is swallowed all of it does not immediately reach the blood. The body will absorb only such fluid from the stomach as it can dispose of. 'Speed of intake is balanced by speed of outgo.' [Dr. Yandell Henderson.] And 'during the time that the alcohol is being slowly absorbed into the blood, the body is busily engaged in oxodizing, destroying or eliminating it.' [Idem.] Alcohol in a weak solution is absorbed more slowly than alcohol in a strong solution. The same quantity of liquid is absorbed, of course, but the amount of alcohol is naturally less in the dilute solution than in the strong one. When the blood contains a one-thousandth part of alcohol all the medical witnesses agree that its effect begins to show. The experiments of Schweisheimer, a European chemist, show that intoxication, however, does not set in until the blood contains 0.134 to

0.153 percent of alcohol. His conclusions have been accepted by the English Board of Liquor Control. All but one of the medical witnesses agree that it would be a physical impossibility, in view of the fluid capacity of the human stomach, to raise the alcoholic content of the blood to those figures by drinking a malt beverage containing 2.75% alcohol by weight as rapidly as room could be found for it in the stomach. The difference between 2.75% and 3.2% is so comparatively slight as to lead me to believe that the same factors which brought about that conclusion compel a similar one where the beverage is of the latter alcoholic content. There is, however, one dissenting medical vote. Dr. Walter R. Miles, Professor of Psychology of Yale University, who testified at the congressional hearing, expressed the opinion that intoxication could be produced by the consumption of a 2.75% malt beverage. However, his conclusion was based on a series of experiments in which the subjects drank a mixture of grape juice and water containing alcohol of the above named percent. One subject was given near beer which had been raised to 2.75% by adding alcohol. But it is plain that Dr. Miles' opinion was based on the results obtained from the experiments in which the grape juice and water mixture was used. That fact, I think, seriously affects its soundness, not merely because his subjects were not given a malt beverage, but also for another reason found in the report of an investigation made by an eminent Swedish authority. The latter's experiments disclosed that the blood would take on alcohol more rapidly from a solution of whiskey diluted down to where it contained only 5.5% alcohol than it would from 'stout,' a malt beverage also of 5.5% alcoholic content. From that observed fact he concluded: 'Either whiskey contains something which hastens alcoholic absorption, or, what is more probable, that stout contains something which tends to delay absorption.' It may well be, therefore, that the absorption observed by Dr. Miles in the subjects to whom he gave the alcohol grape-juice-water mixture would not have been so rapid had he given them the same amount of alcohol in a fermented malt beverage such as stout or beer. The

scientific method of determining intoxication is not an impractical plaything of scientists or a device whereby those of them who are liberal can fog the issue and conceal the intoxicating quality of a beverage. It is in practical and every day use in Sweden as the basis of determining whether operators of motor vehicles suspected of operating the same while intoxicated should be so charged. All Swedish police stations are provided with a device for extracting a few drops of blood from the prisoner and those drops are analyzed at a central laboratory and reported back to the particular station.

''The empiric testimony supports the conclusion of the medical and scientific experts. The lay witnesses have either experimented on themselves by drinking all of the new beverage they could consume or have observed the effects of the same on others who did so. All agree that no intoxication resulted.''

The chancellor further found that since the appearance of the new beverage on April 7th last, it has been constantly drunk by employees holding responsible positions requiring precise mental or physical effort during their hours of employment without objection from their employers; that the drunk who has partaken solely of the new beer is yet to be seen; and that there has been a general decrease in the number of arrests for drunkenness since April 7th.

The evidence in this case fully supporting the chancellor's conclusions of fact, we conclude that the appellee's product, a fermented malt beverage containing no more than 3.2 per cent. of alcohol by weight, is a nonintoxicating beverage. This being the case, the injunction sought was properly granted. The judgment is affirmed.

Whole court sitting.